[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The two cases identified above involve the same CT Page 7890 parties and were consolidated by the court and tried together. The court will consider these cases in the order in which they appear in the heading.
The essential decisions to be made in these cases are straightforward. Two law firms both did work on each of two separate cases. Each firm was the initial attorney on an underlying case and each was replaced by the other. Contingent fees were collected by the succeeding firms. In each case the initial-firm has sued the succeeding firm for a portion of the fee. The court must decide how to fairly apportion the contingent fees in each case.
I. RISCASSI AND DAVIS v. MICHAEL A. PECK, ESQ.
This case involves the division of legal fees earned in the case of Nellie Legnos, Conservatrix of the Estate of Barbara Jane Beck v. Gerald Strauch, et al., hereinafter the "Legnos case". This was a medical malpractice case which the plaintiff accepted on May 17, 1982 and in which the plaintiff represented Nellie Legnos until October 14, 1985, when she arose from the alleged negligent treatment of Ms. Legnos' niece, Ms. Barbara Jane Beck, on or about March 2, 1982. The case was accepted by the plaintiff on the basis of a standard contingency fee arrangement whereby the plaintiff would be reimbursed for its expenses and would receive as a fee one-third of any recovery in the case.
The matter was taken over by Mr. Peck and pursued to a settlement in December of 1986. Mr. Peck accepted the case on the basis of a standard one-third contingency fee and received a structured legal fee in the amount of $444,000. The plaintiff claims a pro rata share of the total attorney's fees, reimbursement for its expenditures in relation to this case, imposition of a constructive trust as to the entire legal fee and treble damages based upon Section 52-564 C.G.S.
The defendant does not deny that compensation and reimbursement are due the plaintiff in this case. It maintains, however, that the correct applicable law in this case is strict quantum meruit which it interprets as the reasonable value of the services rendered by the plaintiff to the date that it was discharged, which the defendant further translates into a straight multiplication of the hours spent times the standard hourly fee charged by the plaintiff.
The plaintiff claims a pro rata share of the aggregate attorney's fee. The plaintiff denies that this is to be interpreted as a strict multiplication of the hours spent times an hourly fee but rather maintains that it is entitled to the CT Page 7891 reasonable value of the services which it has rendered translated, however, into what the defendant has termed an expanded quantum meruit claim, that is reimbursement from the entire legal fee based upon the work which it performed and the benefit to the client, taking into account the result reached in the case and numerous other factors which will be discussed below.
Both parties agree that a starting place in the analysis of the law applicable to this case is Cole v. Myers, 128 Conn. 223,21 A.2d 396 (1941). In Cole our Supreme Court stated at page 230,
 An attorney at law . . . is entitled to fair compensation for his services, but since, because of the highly confidential relationship, the client may discharge him even without just cause, he should receive reasonable compensation for the work he has done up to that point, and not the agreed fee he probably would have earned had he been allowed to continue his employment. This rule is not unfair to the attorney. He will receive fair compensation for what he has done; his position as an officer of the court does not entitle him to receive payment for services he has not rendered.
The defendant puts great emphasis upon the words "up to that point" and maintains that the initial attorney in such a case as this should not be entitled to any portion of the fee based upon considerations pertaining to action in the case which took place after the date of its discharge.
Neither party has found any case directly in point in Connecticut. The plaintiff has cited Knudsen Brothers Dairy, Inc., 24 Bankruptcy Reports 418 (1982), which discusses the term "reasonable value" as set forth in the Bankruptcy Act, pointing out at page 420 that the principal factors which enter into a determination of what is reasonable are the time spent, the intricacy of the questions involved, the size of the estate, the opposition encountered, the results obtained, etc. Beyond the general consideration that "reasonable value" may in some situations involve more than the time spent and may include other factors, this case is not very helpful in this particular situation involving a contingent fee in a medical malpractice case.
The plaintiff also cites the case of Lai Ling Cheng v. Modansky Leasing Company, Inc., 73 N.Y. 2nd 454, 539 N.E. 2nd 570 (1989). In that case, citing several other New York cases, the court stated, page 572 N.E.2d, CT Page 7892
 Where the dispute is only between attorneys, however, the rule is somewhat different. The outgoing attorney may elect to take compensation on the basis of a presently fixed dollar amount based upon quantum meruit for the reasonable value of services or, in lieu thereof, the outgoing attorney has the right to elect a contingent percentage fee based on a proportionate share of the work performed on the whole case. The percentage may be fixed at the time of substitution but, as several courts have recognized, is better determined at the conclusion of the case when such factors as the amount of time spent by each lawyer on the case, the work performed and the amount of recovery can be ascertained.
In this case which was a medical malpractice case, the court found that the first attorney possessed a common law retaining lien on the client's file in his possession which secured his right to the reasonable value of the services he performed. The court held that immediately upon his discharge he was entitled to be compensated in a fixed dollar amount in quantum meruit before he released the file and thereby relinquished his lien. The court further found that when establishing such a fee the court could take into consideration the original retainer agreement, but it could not consider the size of the recovery. The court stated, page 573 N.E.2d, "Indeed, if the fee is computed at the time of discharge, it is difficult to see how it could be considered." In this case, however, the succeeding firm sent a letter to the first attorney requesting that he turn over his file and acknowledging that he had a lien for prior legal services rendered, the amount of which would be determined at the conclusion of the litigation. The letter provided that if the attorneys were unable to agree on the value of the first attorney's services at the conclusion of the action, the matter was to be submitted to a court for determination. The first attorney accepted the terms of the letter by signing and returning a copy to the succeeding firm.
The succeeding firm subsequently commenced a negligence action which was settled before trial for a substantial sum on the basis of which a substantial fee was awarded by the court. In the Lai Ling Cheng case, the court held that the first attorney's present security arose when, in exchange for turning over the file and thereby surrendering his rights under the retaining lien, he obtained from the second firm a contractual lien for prior legal services rendered in the action. The court held that the type of fee depends upon the first attorney's agreement with the second attorney and whether it CT Page 7893 evidences an election of a contingent percentage fee. The court agreed with the initial attorney that reasonably construed the language in the letter provides that he was to be paid a percentage of the recovery since a fixed dollar fee based on the reasonable value of his services easily could have been calculated at the time of discharge without reference to the outcome of litigation or the proportionate share of work performed by each lawyer. The court said, page 573 N.E.2d,
 Inasmuch as the amount of the recovery played no part in evaluating that fee, there was no point in delaying payment of it. However, a contingent percentage fee is properly determined at the end of litigation when the amount of the recovery and the relative contributions of the attorney to it can be ascertained.
It is clear from this and other cases cited in this opinion that under New York law, at least, it is not considered improper or inequitable for the initial attorney to elect to receive his fee based upon factors other than a straight time basis.
The defendant characterizes the reasoning of the court in the Lai Ling Cheng case as questionable and yet it is consistent with other New York cases and with at least one case in New Jersey which is cited by the plaintiff, i.e LaMantia v. Durst, et al., 234 New Jersey Sup. Ct. 534, 561 A.2d 275
(1989). Although this was a dispute between two attorneys over the division of a contingent fee, the underlying facts were somewhat different from the instant case and the Lai Ling Cheng case in that the succeeding attorney in this case was one who had been a member of the first firm and withdrew from said firm, taking with him the file and eventually setting the case for a very substantial amount. The court in this case stated that the central issue is how the contingency fee award should be divided between the first and second firms. It agreed with the trial court that the proper measure of a former firm's compensation involves principles of quantum meruit. It questioned, however, the manner in which the trial court valued the contributions of the respective firms. It stated, page 276 A.2d, "Quantum meruit simply means as much as he deserves," therefore, any distribution of the contingency fee award between two law firms is by its very nature a fact-sensitive decision." The court, after reviewing two New Jersey cases which had been cited to it, stated that New Jersey lacks case law directly on point, but determined that "New York cases have addressed the issue of the proper valuation of quantum meruit in disputes between incoming and outgoing attorneys. The LaMantia court quotes as follows from the case of Cordes v. Purcell, Fritz and Ingrao,89 App.Div.2d 870, [89 App.Div.2d 870], 453, N.Y.S.2d 237, [453 N.Y.S.2d 237], 238 (1982), (page 277 A.2d). CT Page 7894
 Where, as here, the issue is primarily or exclusively between the attorneys and not as between the client and the attorney, the outgoing attorney has the right to elect whether he will take his compensation on the basis of a presently quantum meruit dollar amount, or whether still on the basis quantum meruit, he will take a contingent percentage to be determined at the conclusion of the case.
In The Matter of Chow, 656 P.2d 105, cited by plaintiff, the intermediate Court of Appeals of Hawaii stated, page 11 A.2d, "Where an attorney employed under a contingency contract is discharged prior to the occurrence of the contingency, the contract is terminated. The attorney is, however, entitled to a reasonable attorney's fee based upon all relevant factors. In discussing relevant factors the court took into account other items than simply hours spent.
In addition to the above cases the plaintiff also cites that of Mulhern v. Roach, 398 Mass. 18, 494 N.E.2d 1327 (1986). This case does not involve a contest between two attorneys but rather a contest between the attorney and a client as to the reasonable value of the services rendered by the attorney and in arriving at its conclusion the Massachusetts court takes into account among other things the results secured in the case.
The defendant relies heavily upon the case of Johns v. Klecan, 198 Ill. App. 3rd 1013, 556 N.E. 2nd 689 (1990). In that case the court states that the approach to be taken in cases of this type (contingency fee, personal injury case, where the first attorney was discharged) is to determine the amount of total time spent on the case in performing legitimate services for the client and then multiplying that time by a reasonable hourly rate. The court goes on to state that this is the best method to determine the reasonable value of a discharged attorney's services; the approach avoids the problems inherent in the comparison/apportionment approach and it is much easier for a trial court to undertake this approach than to place the value on the perhaps widely varying services performed by attorneys, vis-a-vis the client's ultimate recovery. The defendant, however, overlooks the fact that the court expressly held in this case, that the time and labor required in the case is but one factor to be considered in determining a reasonable attorney fee under the doctrine of quantum meruit. The other factors are the attorney's skill and standing, the nature of the case and CT Page 7895 the novelty and difficulty of the subject matter, the degree of responsibility in managing the cause, the usual and customary charge in the community and the benefits resulting to the client. The court makes it quite clear that the time and labor required are but one factor in the quantum meruit equation. The quotation relied on by the defendant is considered by the court to be the correct approach only in arriving at the time and labor element of a quantum meruit fee award. On page 696 of The Northeast Reporter the court states, ". . . evidence relating to the time and labor element of that calculation, if sufficient, is to be considered along with any evidence relating to the additional factors." The court in that case states also at page 696 "In summary, we hold that an attorney working on a contingency basis in a personal injury case is not required to present evidence as detailed as that required in Kaiser (the case which is being distinguished by this court) to establish his right to a reasonable fee under quantum meruit in case of discharge. When he presents sufficient evidence of the time and labor which he spent on his former client's case, that evidence must be considered along with all the other relevant factors in deciding upon his entitlement to any fees for services rendered."
Aside from the criticism of the reasoning in the Lai Ling Cheng case; quotations from a 1922 Virginia case, County of Campbell v. Howard, 133 VA. 19, 112 S.E. 876 (1922) which involved, a suit between an attorney and client which case would have no application to the instant case and the above-noted quotation from Johns v. Klecan, the defendant has relied mainly upon his own experience and has offered several cases in which he has participated and in which the initial attorney's fee was calculated on a straight hourly basis, seeking to have the court determine that this is the customary and correct way to apportion a fee when an attorney has been discharged.
In addition to its citations to the case law of New York, New Jersey and Hawaii. as noted above, the plaintiff offered the testimony of an expert witness as to the practice and custom and the standards that are used in the state of Connecticut in resolving disputes regarding a contingency fee when one attorney has been replaced by another. The expert, Mr. Ralph Elliott, is a former president of the Connecticut Bar Association, a former chairman of the Connecticut Bar Association Committee on Professional Ethics and a member of that committee for a long period of time. He also taught Legal Ethics at the University of Connecticut Law School for a substantial period of time. Mr. Elliott testified that in a dispute over a contingency fee between two law firms CT Page 7896 the practice in Connecticut has been for the lawyers to attempt to resolve the matter between themselves, and, if they cannot, to submit it to the Fee Arbitration Dispute Committee of the Connecticut Bar Association which had been set up many years ago for this purpose and in order to avoid litigating these matters in court. In answer to a specific question, as to a contingent fee matter he stated ". . . the standards generally would be those set forth in Rule 1.5 of the Rules of Professional Conduct and generally they would look to the value of the services performed, who performed them, how much work was done, what the expertise of the person was, what the novelty of the questions were, essentially a quantum meruit basis." R. page 216. In answer to the specific question as to whether quantum meruit means an hourly billing for the two firms, he stated, "No, it doesn't mean an hourly billing for the two firms. Number of hours that were spent obviously would be a factor in the mix, but other factors would be the quality of the work done, the amount of work done, the expertise of the lawyer doing the work. An expert lawyer can do in one hour what it would take someone else 10 or 20 hours to do." R. page 217. Rule 1.5 of the Rules of Professional Conduct, reads as follows:
 (a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of the fee include the following:
 (1) The time and labor required, the novelty and difficulty of the questions involved, and The skill requisite to perform the legal service properly;
 (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
 (3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved in the results obtained;
 (5) the time limitations imposed by the client or by the circumstances;
 (6) the nature and length of the professional relationship with the client;
 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.
In advocating a strict hours times hourly rate approach in this case, defendant would have this court overlook the fact that in a particular case it would be entirely possible for the initial law firm to complete all the work necessary for trial of a case, be forced to give up the file and have a succeeding firm step in and, based upon an analysis of the file, obtain an appropriate settlement in one conference. Yet on CT Page 7897 page 21 of his brief he recognizes that in a case where the first attorney has literally done all of the work necessary before transfer of the file, an exception from his interpretation of the law should be made.
It is the opinion of this court that in Connecticut when an attorney retained by a client on a contingent fee basis has been discharged by that client said attorney is entitled to reasonable compensation for the work that he has done up to the point of discharge. Reasonable value of the services rendered should be determined on a quantum meruit basis. Quantum meruit, however, is not limited to hours spent times hourly rate. Time and labor required in a case is but one factor to be considered in determining a reasonable attorney's fee on the basis of quantum meruit. Other such factors as those outlined in Rule 1.5 can, when pertinent, also be taken into consideration in arriving at a reasonable attorney's fee.
While the defendant places great emphasis on the words "up to that point" which appear in the opinion of the Connecticut Supreme Court in Cole v. Myers, p. 230, where the court states that the discharged attorney should recover not the full agreed contract, but "reasonable compensation for the work he has done up to that point," the court cannot agree that this precludes taking into consideration other factors in the case, where appropriate, in arriving at a reasonable fee based upon quantum meruit. A more reasonable interpretation of that phrase as it pertains to a situation such as in this case would be that in comparing the amount of time spent by one attorney as against that spent by another attorney, if it should appear that for some reason the initial attorney had spent some time on the file subsequent to the date of discharge, that time could not be included in arriving at the time spent and ultimately the reasonable value of the services rendered after taking into account the additional pertinent considerations mentioned in Rule 1.5. The use of a pro rata approach to a division of the contingent fee is recognized by the Ethics Committee of the Connecticut Bar Association in its formal opinion No. 31, both as originally issued in 1978 and as revised in 1988. In stating the conditions under which a new attorney may accept a case after the initial attorney has been discharged the committee states that the new attorney must provide one of the following;
 (a) An agreement signed by both the initial attorney and the new attorney establishing the method for division of the ultimate fee. As suggested by our Supreme Court this might be through the payment of compensation for the number of hours the initial CT Page 7898 attorney has spent or perhaps for the pro ration of the contingency fee between the two lawyers based upon the hours each spends.
The plaintiff in this case accepted a medical malpractice case on May 17, 1982 which arose from the alleged negligent treatment of Mrs. Legnos' niece, Mrs. Barbara Jane Beck, on or about March 2, 1982. Mrs. Legnos was appointed conservatrix of her niece with the assistance of plaintiff. The plaintiff drafted correspondence, investigated the medical questions involved, consulted with expert witnesses, filed a complaint, closed the pleadings, filed an answer to interrogatories, conducted depositions and answered correspondence. Virtually the entire file in this case has been entered into evidence by plaintiff and was examined by the court, both as to quantity and quality, of work. The plaintiff in its pre-trial and post-trial briefs has gone into considerable detail as to the work which it performed, all of which has been examined by this court. Plaintiff also provided a schedule of the work which it performed with an estimate of the number of hours or fractions of hours spent on each item listed in the schedule. The plaintiff does not normally keep track of its contingency files on an hourly basis. The number of hours scheduled are an estimate and total 345.65 hours.
The plaintiff was discharged by Ms. Legnos in a letter dated October 14, 1985, three and a half years after the plaintiff had been retained on the contingency basis. Over this period of three and a half years the plaintiff performed all of the work of gathering background information and filing pleadings that one would expect a competent law firm to perform in reference to a somewhat difficult medical malpractice case, with, however, some exceptions. The plaintiff, through Attorney Nicole Rubinow, and others, consulted with two doctors; Dr. Terico and Dr. Crombie and made copious notes in the file as to conversations with these doctors but did not obtain any written report from either. Dr. Terico was declared to be an expert witness by the plaintiff in answer to an interrogatory. Dr. Crombie was not mentioned as an expert witness. Ms. Rubinow, Mr. Davis and Attorney Stephen Traub in their testimony, all maintain that, contrary to the practice of some attorneys of obtaining complete medical reports from their expert witnesses, they discourage this practice. Considering the expertise of these attorneys in this field of medical malpractice it is not for this court to say which is the better strategy, that used by Mr. Peck in obtaining a medical report or that used by the plaintiff in not obtaining one at least until after the deposition of the expert. Suffice it to say that the court is satisfied that the function of obtaining CT Page 7899 sufficient expert medical opinion to make out a negligence case was fulfilled by the plaintiff.
One of the problems encountered in this file is that after three and a half years, although the plaintiff had declared Dr. Terico would be its expert witness, in fact, unbeknownst to the plaintiff, Dr. Terico had accepted employment with an insurance company and was not available and would not be available as an expert witness. Why the plaintiff was not aware of this at such a late date is not made clear, and whether or not at the time of trial plaintiff would have been allowed to substitute an expert witness remains a question mark depending upon the time element and when the case would, have been assigned for trial.
The defendant, who does not deny that the plaintiff is entitled to some compensation for work performed in the file, was agreeable to the entire file being placed in evidence. He points out that the plaintiff viewed the Beck case as an extremely difficult one and that the plaintiff had doubts concerning the viability of the claim and that this attitude persisted until discharge. This is borne out by the evidence. There are some substantial time lapses between various times when work was performed in this file and the defendant attributes these also to the doubts as to the outcome of the case which were held by the plaintiff's attorneys. The defendant also points out that the plaintiff after three and a half years had not deposed Dr. Dragon, one of the defendants in the case, who had provided post-surgical care during the time negligence was alleged; had had no contact whatsoever with the insurance carriers with a view to settlement and that the case had been placed on the dormancy list at one time.
The court is of the opinion that the plaintiff was somewhat dilatory in pursuing the work accomplished in this file and that after three and a half years it should have been aware of the fact that it did not have an expert ready to testify and be deposed, that it should have by this time deposed the defendant, Dr. Dragon, and the court is of the opinion that by this time, although the docket was such that the case may not have been able to be tried for two more years, it should have had the file in a condition where negotiations for settlement could and should have been commenced.
The defendant shortly after taking over the file determined through Attorney Coombs that neither Dr. Terico nor Dr. Crombie would be available to testify in the case. He proceeded to get an expert, Dr. Michaelson, who furnished him with a report. He then opened negotiations CT Page 7900 with the insurance carrier for the New Britain General Hospital. Shortly after this the adjuster for the hospital received authority in the case. Mr. Peck conducted multiple intensive negotiations with the insurance carriers and multiple pre-trial conferences with Judge Goldberg.
Later, he succeeded in bringing about a settlement of the case with a fee of $444,000, which, however, was structured, netting him a payment of $86,000 to begin with. Mr. Peck achieved a positive result satisfactory to the client within a relatively short time.
However, despite protestations to the contrary the court finds that the defendant did utilize the work of the plaintiff in setting the Legnos case. It would have been impossible for it to proceed without the plaintiff's file since obviously it did not duplicate the work in that file.
Although the defendant maintains that it arrived at the correct theory of negligence in this case without the assistance of the plaintiff firm, the court is of the opinion that this is not true and that its view of the negligence in the case did not differ substantially from that already adduced by the plaintiff firm.
Mr. Peck claims that plaintiff failed to recognize the cause of the malpractice. He claims that he came up with the correct grounds for malpractice, his "but for" theory, i.e. "but for" the inadequate reasastamosis of the colon and septic shock Ms. Beck's cardiac arrest would not have occurred. Dr. Michaelson, his witness, however, deleted such a claim from his report and espoused the original theory propounded by plaintiff that the negligence in the Legnos case was the failure to timely diagnose the post-surgical complications.
The plaintiff produced Attorney Stephen Traub, a well-known attorney in the field of medical malpractice, whose office is in New Haven. Both Mr. Traub and Mr. Davis of the plaintiff's law firm are well known in the field and highly respected and are viewed by the bar in general and this court as experts in the field of medical malpractice. Mr. Traub testified that he analyzed the entire file in the case and listened to the testimony of all the witnesses for the plaintiff, i.e., Ms. Rubinow and Mr. Davis; and that he had taken into account the elements of quantum meruit as set forth in the factors to be considered in determining a reasonable attorney's fee contained in Rule 1.5 and he felt that the plaintiff law firm should be entitled to 70% of the contingency fee and the defendant's law firm should be entitled to 30%. On cross-examination he reduced that figure to 50/50 in the event CT Page 7901 that at the time of trial the plaintiff had no expert witness, to testify.
As stated above, in a letter dated October 14, 1985, Mrs. Legnos terminated the services of the plaintiff law firm and gave Attorney Peck "authority to work out an appropriate fee agreement with RisCassi and Davis for their services to date." Plaintiff very shortly thereafter transferred the entire file to the defendant without any discussions as to a fee. Upon receiving the termination letter the plaintiff could have attempted to enter into an agreement to determine the plaintiff's fee based upon the number of hours spent times an hourly rate. The defendant at least in its brief indicates that it was of a frame of mind to be quite generous in such a regard. Since no such attempt was made, it was clear at this point that a fee was to be worked out in the future considering that the defendant admitted that it owed compensation to the plaintiff.
It is the opinion of this court that the plaintiff intended to charge a fee based upon a pro rata share of the work done on a quantum meruit basis in accordance with Rule 1.5 of the Rules of Professional Conduct and that the defendant should have known this.
While Mr. Davis testified that he normally would pay one-third of the one-third contingent fee if he were the succeeding attorney, the court cannot, as urged by the defendant, use this as a measure of the plaintiff's pro rata share of the fee without ignoring Rule 1.5 of the Rules of Professional Conduct since the plaintiff made no such claim in this case.
This court, having heard the testimony of the parties and the witnesses and having examined in detail all of the exhibits in this case, which include the entire Legnos file, and giving due consideration to the expert testimony of Attorney Traub; taking into account the fact that expert medical testimony is necessary in a medical malpractice case, and that this was accomplished by Mr. Peck, but also recognizing that it might have been accomplished by the plaintiff in due time, and weighing such factors as the approach of the plaintiff, the consequent dissatisfaction of the client, the aggressive approach of the defendant (dependent, however, on the preparation of the plaintiff) and considering the result and the satisfaction of the client is of the opinion that a just and equitable pro rata division of the contingency fee in the Legnos case would be 40% to the plaintiff and 60% to the defendant and the court so holds. CT Page 7902
The court is of the opinion that this division is fair even though it gives less weight to the more or less mechanical, although time-consuming and burdensome, function of gathering information and preparing pleadings and more weight to the development of a medical expert's report and expeditious negotiation of a settlement than does the plaintiff. It fairly compensates the plaintiff for its time and for its contribution to the outcome.
It is, therefore, the judgment of this court that the defendant shall pay to the plaintiff a sum equal to 40% of the contingent fee realized in this case, i.e. $176,000.00 with interest on each payment of a portion of the fee to him from the date that each portion of the fee, which was structured, was paid over to him. In addition thereto, the defendant shall pay to the plaintiff the sum of $3,505.27 in expenses, plus interest thereon from the date that the first payment was made to the defendant on the contingent fee.
Evidence introduced by plaintiff referring to correspondence in the file of Mr. Johnson, the insurance adjuster, indicating that Mr. Peck's lack of stature in medical malpractice cases and references to other personal legal problems of Mr. Peck that may have led to a lower settlement figure than Mr. Davis might have attained are irrelevant to a consideration of what portion of the fee was earned by plaintiff and have been disregarded by the court in arriving at its decision. The plaintiff had not conducted any negotiations with the insurance company before discharge and Mr. Johnson did not receive authority until after the discharge.
Various allegations and arguments made by the defendant, e.g., statements made by Mr. RisCassi that "if Ms. Legnos insists on having her file consider agreeing on payment of costs" and a suggestion to Mr. Davis by Ms. Rubinow that they should charge on an hourly basis are not discussed in detail because the court considers them irrelevant to the issue of a division of the fee. Mr. Davis never authorized them. Also the "competing policy considerations" mentioned on page 23 of the defendant's brief are not discussed in detail because the court does not consider that they add anything to the defendant's argument since the defendant admits compensation is due the plaintiff.
Defendant's claim of constructive withdrawal by the plaintiff belies the instant action and thus has no merit.
The plaintiff has claimed treble damages under Section52-564 C.G.S. In the opinion of this court, this section is CT Page 7903 not applicable. Although this is not a criminal prosecution and it is not necessary to prove the allegations beyond a reasonable doubt, the court is of the opinion that there has been insufficient evidence adduced in this case to prove that the defendant stole or intended to steal plaintiff's fee, or that he concealed stolen property. Neither party acted in a very business-like manner in not discussing a fee arrangement at the time of the discharge. The defendant, however, in accordance with Formal Opinion No. 31, was under an obligation to provide the initial counsel with either:
A. An agreement signed by both the initial attorney and himself, establishing the method for division of the ultimate fee, or B. a letter stating that upon the conclusion of the client's matter, he will hold in his client's funds account the amount required under the initial lawyer's contingency fee arrangement until its disposition has been determined by agreement/voluntary fee dispute arbitration proceedings or a court.
Although no discussions took place and no letters were exchanged, the defendant, having participated in a number of cases where one attorney is succeeded by another and fee arrangements were entered into and having admitted that he was aware at all times that the plaintiff was entitled to compensation for his services, was in clear violation of the escrow provisions of this opinion and should have notified the plaintiff when the case was settled.
The defendant's argument that failure by the plaintiff to "insist" upon a fee arrangement does not absolve the defendant of the duty to escrow the fee until a determination has been made as to the division of same. The court recognizes that he did escrow a portion but belatedly. Since neither party paid any attention to Opinion No. 31, the court finds that this failure by the defendant is insufficient for imposition of treble damages under the statute.
Judgment may enter for the plaintiff in the Legnos case in accordance with this opinion.
II. MICHAEL A. PECK v. WILLIAM DAVIS, DBA
The case underlying this suit (hereinafter the Dillworth case involved an action for personal injuries suffered by David Dillworth, who was seriously injured in a collision due to the negligence of Robert J. Raczorowski, who was engaged in performing work for his employer while driving his wife's automobile.
The situation in this case is the reverse of that in CT Page 7904 the Legnos case. The plaintiff, Michael Peck, was the initial attorney and was retained on a one-third contingent fee basis in the Dillworth case. He was discharged by the plaintiff and was replaced by the law firm of RisCassi and Davis, the defendants in this case, which in turn was also retained on a one-third contingency fee basis.
The plaintiff was retained on July 27, 1984 and his services were terminated on February 1, 1986. The plaintiff gathered information, obtained medical reports and bills, as well as lost wage information. Mr. Dillworth's injuries were significant as was his monetary loss. The liability was clear. The defendant, Kaczorowski, the driver and owner of the vehicle, was insured under an automobile liability policy with a maximum coverage of $100,000.
Attorney Peck "set about to obtain the $100,000 maximum coverage." He obtained the full policy limit and also obtained for his client an advance of $33,333.33, in accordance with his wishes since he was in great financial difficulty due to the accident. Mr. Peck recommended to Mr. Dillworth that the file be closed out on the basis of the $100,000 offer but Mr. Dillworth refused.
The original complaint was filed in May of 1985 suing the driver and his wife. In July, the plaintiffs filed a motion to add a party defendant and in August the Mercantile Acceptance Corporation was added as a party defendant. The addition of the Mercantile Acceptance Corporation was the result of the pursuance by the plaintiff of a vicarious liability theory in order to tap into another larger policy, of the negligent driver's employer. Attorney Peck claims that the theory of bringing in the employer's auto insurance policy was a very creative concept.
The defendants in this case filed their appearance in February of 1986 and filed a substitute complaint on May 14, 1986. They obtained their first answer on July 23, 1986, thus closing the pleading as of that time. In October of 1986 the defendants filed another substituted complaint. Thereafter, there was continuous correspondence with doctors, lawyers, experts, witnesses, etc., all culminating in a jury trial. This case went to a verdict and a recovery of $280,000 was obtained. The defendant charged a fee of $78,829.58. This fee has been kept in escrow since it was recovered. Whereas in the Legnos case, Mr. Peck claimed that the initial attorney should be paid on a quantum meruit basis confined strictly to hours worked times hourly rate, in this case, where he was the initial attorney, he claims that he is entitled to his contingency fee as to the $100,000 offer to settle the case CT Page 7905 made by the defendants' liability carrier. This was the maximum available under the policy and he also obtained an advance. The plaintiff, Mr. Dillworth, was not satisfied with the offer as a total recovery and rejected same. With respect to the case against the employer which was later pursued to a verdict by the defendants, the plaintiff's claim to a unique and creative theory of the case is not unlike his claim to a creative, unique "but for" theory of liability in the Legnos case.
The defendant in this case furnished the court with a complete file containing both the work of the plaintiff and the defendant in this case. There is no evidence of any research done by the plaintiff with respect to this "unique" theory. There are substantial memos, however, showing a complete analysis of the insurance policies and the liability based upon respondent superior by the defendants. On this point the court is in agreement with the defendant that the development of this theory involved no new or particularly unusual legal concepts since it was apparently known from the beginning that the defendant, although driving his wife's car, was working for his employer at to time of accident. The plaintiff was astute enough to pursue the agency theory when put to it and deserves some credit for that, but it was no more than any other competent attorney should have done under the circumstances.
The plaintiff maintains that the $100,000.00 was a standing offer from the time he first obtained the policy limit offer. It has been this court's experience that most insurance companies will resist paying the policy limit, and the plaintiff is entitled to credit for obtaining this and also for obtaining an advance for his client.
The fact brought out by defendant that the verdict in the Dillworth case was less than the insurer's final offer adds nothing to the plaintiff's case.
In the opinion of this court, the rules pertaining to this case are the same as those pertaining to the Legnos case and the fee should be apportioned between the parties on the same basis as in that case, i.e., in accordance with Rule 1.5 of the Rules of Professional Conduct. In this case, as in the Legnos case, no expert was provided by the plaintiff but an expert, Mr. Stephen Traub, was provided by the defendant. Mr. Traub analyzed the file which was provided to him and in his opinion stated that he felt that the defendant had performed approximately 80% of the work done in this file whereas the plaintiff performed perhaps no more than 20%. The court, as it did in the Legnos file, has gone in detail through this file, has taken into account those factors CT Page 7906 outlined in Rule 1.5, which are pertinent to this case, and is of the opinion that the witness' analysis fails to give sufficient credit for the accomplishment of the plaintiff. Although the court cannot agree that he is entitled to one-third of the recovery of the insurance policy, he must be given credit for same and for the advance to the client, as well as resort to the "respondent superior" theory when put to it. These actions relieved the succeeding attorney of a great deal of work and paved the way to pursue a theory which did result in a good recovery for the client.
It is the opinion of this court that the contingency fee of $78,829.58 should be divided on the basis of 70% to the defendant, RisCassi and Davis, and 30% to the plaintiff, Michael A. Peck. In addition thereto, although no figure appears in the file, the defendant must pay to the plaintiff any outstanding expenses which he may have incurred in relation to the Dillworth case.
Judgment may enter for the plaintiff, Michael A. Peck, in the amount of $23,648.87 plus interest thereon from the date that the original fee was received by the defendant firm.
Judgment may enter for the defendant for the balance of the fee, i.e. $55,180.71 plus any interest earned on same while in escrow.
Judgment may enter for the plaintiff, Michael A. Peck, in the amount of the unreimbursed expenses incurred in handling the Dillworth file, same to be determined by agreement of the parties but if they cannot agree, to be determined by this court.
HALE, J.